**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

WILLIAM MCNEILL and LISA MCNEILL,

        Plaintiffs/Counter-Defendants,

vs.                                                                                        No. CIV 24-0032 JB/SCY

WILLIE LOEWEN and EVA LOEWEN,

        Defendants/Counter-Plaintiffs.

<u>**MEMORANDUM OPINION AND ORDER**</u>

    **THIS MATTER** comes before the Court on a two-day bench trial ("Bench Trial") in this matter.  See Clerk's Minutes at 1, filed March 16, 2026 (Doc. 115)("Clerk's Minutes").  The Court holds the Bench Trial on March 16, 2026, and March 17, 2026.  See Clerk's Minutes at 1.  The primary issues are: (i) whether Plaintiffs/Counter-Defendants William McNeill and Lisa McNeill are entitled to damages for the first two years of grazing rights that the Defendants/Counter-Claimants Willie Loewen and Eva Loewen agreed to under the New Mexico Ranch Purchase Agreement (dated November 11, 2021)(admitted into evidence on March 16, 2026 on Day 1 of the Bench Trial as  Plaintiff Tr. Ex. 1)("Purchase Agreement"), because the Loewens do not notify the McNeills that the land is available to graze; (ii) whether the McNeills waive their rights to the third year of grazing rights under the Purchase Agreement, because the McNeills do not accept conditions which the Loewens place on the use of the grazing rights; and (iii) whether the McNeills fail to meet their duty to mitigate damages.  The Court concludes that: (i) the McNeills are not entitled to damages for the first two years of grazing rights under the Purchase Agreement, because the McNeills do not take reasonable measures to exercise their right; (ii) the McNeills are entitled to damages for the third year of grazing rights, because the conditions which the Loewens place on the grazing rights are counter to the requirement in the Purchase Agreement that the grazing

rights will be given at "no charge to Seller," Purchase Agreement ¶ 2, at 1; and (iii) the McNeills do not fail to meet their duty to mitigate damages.

## **FINDINGS OF FACT**

Following the two-day Bench Trial, the McNeills and the Loewens submit proposed findings of fact. See Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed April 17, 2026 (Doc. 119)("McNeill FOFs"); Defendants' Requested Findings of Fact and Conclusions of Law, filed April 17, 2026 (Doc. 120)("Loewen FOFs"). The Court has considered carefully the McNeills' and the Loewens' proposed facts, and accepts some of those facts, rejects some, and finds some facts that no party brought to its attention.[1] The Court's findings of fact are:[2]

1.      W. McNeill is a cattle rancher, who was raised in the business and has ranched as an occupation since 1993. See McNeill FOFs ¶ 8, at 2;[3] Day 1 Bench Trial Proceedings Transcript at 22:22-24 (taken March 16, 2026)(Moore, W. McNeill), filed April 16, 2026 (Doc. 116)("Day 1 Tr.").[4]

---

[1] Although the parties express many of the background facts differently, they do not dispute many of those facts. The Court has, throughout its findings, synthesized the parties' proposed findings where they are fully compatible. In many cases, the Court adopts one party's finding and declines to adopt the other's finding for stylistic reasons: for example, where one party's proposed findings more completely discuss a fact than another party's proposed fact, the Court generally has adopted the more thorough discussion. Where the Court determines that the proposed facts differ, the Court analyzes the applicable evidence and makes a finding. The Court discusses in the footnotes why it makes a factual finding when the parties differ.

[2] Where the Court adopts one party's finding and declines to adopt an opposing party's finding for a substantive reason -- that is, because the evidence better supports one finding than another -- the Court explains the reason for that conclusion in the footnotes.

[3] The McNeill FOFs do not contain internal page numbers. The Court, therefore, refers to the CM/ECF page numbers.

[4] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

2.      W. Loewen is a cotton farmer.  See Day 2 Bench Trial Proceedings Transcript at 341:17-19 (taken March 17, 2026)(Jenkins, W. Loewen), filed April 16, 2026 (Doc. 117)("Day 2 Tr.").[5]

3.      On November 11, 2021, the McNeills and the Loewens enter into a Purchase Agreement.  See McNeill FOFs ¶ 9, at 2; Loewen FOFs ¶ 1, at 1.[6]

4.      In the Purchase Agreement, the McNeills agree to sell, transfer, and convey the McNeill Farm in Lea County, New Mexico (the "Property") to the Loewens.  See McNeill FOFs ¶ 10, at 2; Day 2 Tr. at 342:2-9 (W. Loewen).

5.      In exchange for conveying the Property, the Loewens agree to pay $2,500,000.00 and, as additional consideration, the Loewens agree to give the McNeills the right to graze livestock, at no charge to the McNeills, on three irrigated circles of at least 120 acres of planted and maintained wheat in Lea County, New Mexico, Gaines County, Texas and/or Yoakum County, Texas, for five years with each year of grazing beginning November 1 and ending April 15 of each year after the close of the transaction.  See McNeill FOFs ¶ 12, at 3; Loewen FOFs ¶¶ 2-3, at 1-2.

6.      The McNeills and the Loewens close on the Purchase Agreement in January, 2022. See McNeill FOFs ¶ 13, at 3; Loewen FOFs ¶ 4, at 2.

7.      The McNeills then convey the Property to the Loewens.  See McNeill FOFs ¶ 14, at 3; Day 1 Tr. at 28:20-23 (Moore, W. McNeill).[7]

---

[5] The McNeills neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. Loewen's testimony on this point, because the record contains no contrary evidence.

[6] The Loewen FOFs do not contain internal page numbers.  The Court, therefore, refers to the CM/ECF page numbers.

[7] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact,  but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

8.     The Loewens pay the McNeills the contractual price of $2,500,000.00.  See McNeill FOFs ¶ 15, at 3; Day 1 Tr. at 28:16-19 (Moore, W. McNeill).[8]

9.     The first year of grazing rights begins on November 1, 2022.  See McNeill FOFs ¶ 17, at 4; Day 1 Tr. at 30:22-25 (Moore, W. McNeill).[9]

10.    The Loewens do not offer any land to the McNeills for the McNeills to graze for the first year.  See McNeill FOFs ¶ 17, at 4; Loewen FOFs ¶ 72, at 8 ("Mr. Loewen intended that the McNeills would exercise the right to graze by calling and never did so.").

11.    W. McNeill attempts to contact W. Loewen by telephone call regarding the first year of grazing rights and leaves a voicemail.[10]

12.    W. McNeill does not send any text messages to W. Loewen regarding the first year of grazing rights.  See Loewen FOFs ¶ 48, at 6; Day 1 Tr. at 87:10-12 (Jenkins, W. McNeill).

---

[8] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[9] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[10] The Court concludes that W. McNeill calls W. Loewen regarding the first year of grazing rights, because the Court credits W. McNeill's testimony, see Day 1 Tr. at 40:4-6 (W. McNeill)(indicating that he attempted to contact W. Loewen regarding the first year of grazing rights: "Phone calls, left voice messages.  Didn't get any response.  Called a mutual friend to verify that the number was right.  The number was correct.").  In reaching this conclusion, the Court does not discredit W. Loewen's testimony that he never receives a voicemail, because W. Loewen testifies that his telephone often drops calls.

> "If you're in a barn, if you're working in the barn, and somebody calls you, you will never get it.  You could be driving down the road, you make a turn, the call drops.  I can testify to that all day long.  My wife calls me sometimes 10, 15 times.  She finally comes through.  She goes: Were you on the phone? No, why? Well, I've called 10, 15 times.  It didn't ring."

Day 2 Tr. at 358:4-10 (W. Loewen)

13.    The Purchase Agreement allows grazing rights on "up to three irrigated circles of wheat."  Purchase Agreement ¶ 2, at 1.

14.    The Loewens maintain three circles of irrigated wheat in 2022.[11]

15.    The Loewens reject other ranchers' offers to graze in 2022.  See Loewen FOFs ¶ 58, at 7; Day 1 Tr. at 243:16-18 (Jenkins, W. Loewen).[12]

16.    The Loewens confirm to third parties, including to Boyd, that the McNeills have the first right of refusal on grazing.  See Loewen FOFs ¶ 57, at 7; Day 1 Tr. at 243:12-15 (W. Loewen).[13]

17.    Boyd has known the Loewens for "close to 15 years" and has put cattle on the Loewens' property several times in the past.  See Day 1 Tr. at 169:2-7 (Moore, Boyd).[14]

---

[11] The Court concludes that W. Loewen has three circles of irrigated wheat available in 2022, because it credits W. Loewen's testimony.  See Day 1 Tr. 240:22-241:2 (Jenkins, Loewen)("Did you have up to three irrigated circles of wheat that you owned in your name or in the name of an entity? Yes. Did you have that in 2022? Correct.").  The Court notes the McNeill FOF which asserts that the photographs of fields from 2025 are "based on credible testimony by Mr. McNeill and Mr. Boyd, the fields . . . shown were not suitable for placing cows [TR 34:10-19, 181:11185:24], which Mr. Loewen did not controvert." McNeill FOFs ¶ 37, at 9.  The Court determines that the field condition for grazing in 2025 does not inform whether W. Loewen has three irrigated wheat circles as he contracts to provide in 2022, and because there is no evidence to the contrary in the record, the Court credits W. Loewen's testimony.

[12] The McNeills neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. Loewen's testimony on this point, because the record contains no contrary evidence.

[13] The McNeills neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. Loewen's testimony on this point, because the record contains no contrary evidence.

[14] The parties neither stipulate to nor mutually propose ¶ 17,  but the Court credits Boyd's testimony on this point, because the record contains no contrary evidence.  Further, the Court declines to adopt the Loewen FOF ¶ 60, at 7, which states: "Mr. Loewen was told by Mr. Boyd that the McNeills were not grazing in 2022."  Loewen FOF ¶ 60, at 7.  Boyd testifies multiple times that he does not tell W. Loewen that the McNeills are not going to graze, and the Court credits Boyd's testimony because he knows best what he has said.  See Day 1 Tr. at 213:20-22 (Jenkins, Boyd).

18.     W. Loewen does not contact W. McNeill about the first year grazing rights and does not inform the McNeills where the grazing properties are.  See McNeill FOFs ¶ 12, at 5; Day 1 Tr. at 229:24-230:23 (Moore, W. Loewen).

19.     The second year of grazing rights begins on November 1, 2023.  See McNeill FOFs ¶ 18, at 4; Purchase Agreement ¶ 2, at 1.

20.     The McNeills, through counsel, attempt to contact the Loewens regarding the second year of grazing rights by having their counsel send a demand letter to the address the Purchase Agreement lists for the Loewens.  See McNeill FOFs ¶ 18, at 4; Day 1 Tr. at 46:20-47:22 (Moore, W. McNeill); Letter from Jared Moore to Jody Jenkins Re: Grazing Rights (dated September 21, 2023)(admitted into evidence on March 16, 2026 on Day 1 of the Bench Trial as Plaintiff Tr. Ex. 2).[15]

21.     The McNeills do not make any other attempt during the second year of grazing to contact the Loewens.  See Day 1 Tr. at 46:8-10 (Moore, W. McNeill).[16]

22.     The Loewens have problems getting their mail and do not receive the certified demand letter from the McNeills' counsel; it is returned to sender.  See Loewen FOFs ¶ 76, at 9; Day 2 Tr. at 352:11 (W. Loewen).[17]

---

[15] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[16] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[17] The McNeills neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. Loewen's testimony on this point, because the record contains no contrary evidence.

23.     W. Loewen does not contact W. McNeill about the second year grazing rights and does not inform the McNeills where the grazing properties are.  See McNeill FOFs ¶ 18, at 4-5; Day 1 Tr. at 231: 6-13 (Moore, W. Loewen).

24.     After the McNeills do not graze for the first two years, the McNeills file their lawsuit on January 10, 2024.  See McNeill FOFs ¶ 19, at 5; Plaintiff's Original Complaint, filed January 10, 2024 (Doc. 1).

25.     After the McNeills file the lawsuit, the Loewens' counsel writes to the McNeills on the Loewens' behalf regarding the grazing rights for the third year, placing stipulations on the McNeills' access to grazing.  See Letter from Jody Jenkins to Jared Moore (dated October 1, 2024)( admitted into evidence on March 16, 2026 on Day 1 of the Bench Trial as Plaintiff Tr. Ex. 7).

26.     Those conditions are:

 1. The start date will be no sooner than November 1, 2024; 2. Your clients will fence the circles with temporary fencing prior to allowing cattle on the property; 3. Your clients will provide proof of ownership or other authority to control the cattle; 4. Water facilities and water will be provided by your clients and will not be supplied; 5. Wells and pivots must be protected by temporary fencing; 6. Your clients will need to provide proof of liability insurance; 7. The cattle and all temporary fencing will be removed by April 15, 2025; 8. All notices for purposes of grazing will be delivered to my attention while the lawsuit is pending.

Letter from Jody Jenkins to Jared Moore Re: Grazing Stipulations at 1.

27.     The Loewens, through their counsel, send the McNeills an amended list of stipulations for the third year of grazing rights on October 24, 2024, containing the following list of stipulations:

1. The grazing start date will be no sooner than November 1, 2024; 2. Your clients will fence the circles with temporary fencing prior to allowing cattle on the property; 3. Your clients will provide proof of ownership or authority to control the cattle; 4. My clients will hire the necessary contractors to provide for water distribution so long as they are paid $1,000 per circle for such accommodation and will have such facilities in place prior to the grazing start date; 5. My clients will not provide any storage facilities for the water and will only provide access to allow a reasonable amount of water to be consumed during the term of the grazing period;

6. Your clients will pay $100 per month, per circle for the associated utilities; 7. Your clients will protect the wells and pivots with temporary fencing on each circle; 8. Your clients will provide liability insurance naming my clients as additional insureds in a commercially reasonable amount no less than $1,000,000; 9. All temporary fencing and cattle will be removed by April 15, 2025; 10. Your clients agree to indemnify my clients for any damages caused to the wells, pivots, and based upon any allegation of a third party claiming any damages caused by the cattle; and 11. Your clients agree that reasonable farming practices do not require more than 1" of irrigation per circle per month.

Letter from Jody Jenkins to Jared Moore Re: Amended Grazing Stipulations (dated October 24, 2024)(admitted into evidence on March 16, 2026 on Day 1 of the Bench Trial as Plaintiff Tr. Ex. 3).

28.    The McNeills decide that the Loewens' conditions on the grazing rights are unreasonable and do not graze during the third year of grazing rights. See McNeill FOFs ¶ 23, at 6; Day 1 Tr. at 80:10-81:9 (Moore, W. McNeill).[18]

29.    The McNeills disagree with, from the amended stipulations, conditions number four, number six, number eight, number ten, and number eleven. See Day 1 Tr. at 55:21-23 (W. McNeill)("Number 4 is not reasonable. We've never had to pay $1,000 per circle for them to provide a water source."); Day 1 Tr. at 56:18-20 (W. McNeill)("Number 6, never been charged for utilities. That's a cost incurred by the landowner."); Day 1 Tr. at 56:22-23 (W. McNeill)("Number 8, never had a requirement for liability insurance."); Day 1. Tr at 57:4-6 (W. McNeill)("Number 10, I've never been asked to indemnify anybody. And that's so open-ended, that would scare me to take on that responsibility."); Day 1 Tr. at 57:7-10 (W. McNeill)("And number 11 is not

---

[18] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

reasonable. You can't grow wheat, acceptable grazing, by putting an inch a month down and expect to graze cattle from November 1 to April 15.").[19]

30. The Loewens place verbal conditions on Boyd when he grazes the Loewens' land, but not to the extent of the conditions that the Loewens place on the McNeills. See Day 1 Tr. at 172:17-174:2 (Moore, Boyd).[20]

31. W. Loewen does not inform the McNeills where the grazing properties are for the third year of grazing rights. See McNeill FOFs ¶ 23, at 6; Day 1 Tr. at 57:24-58:1 (Moore, W. McNeill).[21]

32. The Purchase Agreement states that the "Buyer shall give Seller the right to graze livestock, at no charge to Seller . . . ." Purchase Agreement ¶ 2, at 1.

33. The Court previously concludes that the term "no charge to Seller" is ambiguous, see Order at 17, filed November 26, 2025 (Doc. 84)("Order on Waiver MSJ"), which means, under

---

[19] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[20] The parties neither stipulate to this fact nor mutually propose ¶ 30, but the Court credits Boyd's testimony on this point, because the record contains no contrary evidence.

> "A: So I'm going to get with Willie, asking whether he wants me to fence it. I'm going to fence off the pivot, if that's what he wants. I'm going to put in the -- from the well to the trough, I'm going to do all that. I'm going to put in the chargers. And then he basically doesn't keep up -- he doesn't keep up any of that part of it. That's my part. Q: And then what do you expect from Mr. Loewen in that situation? A: I expect him to keep the wheat watered, keep it growing, keep feed in front of the cattle."

Day 1 Tr. at 172:17-174:2 (Moore, Boyd).

[21] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

New Mexico law, that the interpretation of this term is a question of fact. See C.R. Anthony Co.

v. Loretto Mall Partners, 1991-NMSC-070 ¶ 17, 112 N.M. 504, 509, 817 P.2d 238, 243 ("C.R.

Anthony")("[I]f the court finds ambiguity, the jury (or the court as the fact finder in the absence of

a jury) resolves the ambiguity as an issue of ultimate fact . . . .").

34.     The contractual term "no charge to Seller" means that the Loewens cannot charge

the McNeills for associated costs with grazing, including the conditions which require that the

McNeills pay $1,000.00 per circle for water distribution and $100.00 per month per circle for

associated utilities.[22]

35.     At the time of trial, the fourth year to graze has not elapsed. See McNeill FOFs ¶

25, at 7; Purchase Agreement ¶ 2, at 1.

36.     For the first year of grazing rights, the second year of grazing rights, and the third

year of grazing rights the McNeills have 360 calves in the area that they intend to put on the three

---

[22] The Court reaches this conclusion in part by looking at testimony regarding the industry standard for grazing cattle in New Mexico. W. McNeill testifies that it is industry standard that the farmer provide the water, because: "If they can't provide the water then I can't haul it every day. I mean, it just doesn't work." Day 1 Tr. at 208:15-209:15 (Moore, W. McNeill). Boyd, who grazes on W. Loewen's land for several years, testifies that he has never had the same conditions placed on him when he has grazed W. Loewen's land, and that he expects that the landowner, specifically W. Loewen, will "keep the wheat watered, keep it growing, keep feed in front of the cattle." Day 1 Tr. at 172:13-173:12 (Moore, Boyd). The Loewens argue that there is "no industry standard that completes the terms of the contract as requested by the McNeills." See FOF ¶ 67, at 8. The Court disagrees. Boyd's sensible testimony indicates that the landowner typically supplies the water to grow the wheat and utilities to provide the water. The Purchase Agreement embodies the industry standard in the words "no charge to Seller," which mean that the landowner bears the costs associated with grazing instead of the rancher under the Purchase Agreement. Both W. McNeill and W. Loewen engage in grazing deals under conditions in the past where the landowner, not the rancher, provides the water. When writing a provision for grazing rights, therefore, both W. McNeill, and especially W. Loewen, understand that grazing cattle requires water and that the landowner is usually the one to provide such water. Accordingly, when providing the right to graze at "no charge," the most reasonable interpretation of this provision is that the landowner will not charge the rancher for the costs associated with grazing which the landowner usually bears.

circles which the Loewens provide, with 120 calves on each circle.  See Day 1 Tr. at 42:3-11 (Moore, W. McNeill); McNeill FOFs ¶ 28, at 7.[23]

37.     Neither the McNeills nor Boyd are aware of alternative land in Lea, Gaines, or Yoakum counties available to graze at no cost.  See Day 1 Tr. at 141:3-14 (Moore, W. McNeill); McNeill FOFs ¶ 27, at 7.[24]

38.     The McNeills do not seek alternative grazing pastures during the first year of grazing rights, the second year of grazing rights, or the third year of grazing rights.  See Loewen FOFs ¶ 30, at 4; Day 1 Tr. at 105:10-18 (Jenkins, W. McNeill).

39.     Had the McNeills been able to obtain alternative grazing pasture, it would have cost $0.65 per pound of gain, which would have lowered the McNeills total loss to $280,800.00 for the three years.  See Loewen FOFs ¶ 34, at 4; Day 1 Tr. at 121:21-25 (Jenkins).[25]

40.     It is difficult to obtain alternative grazing pastures.  See Day 1 Tr. at 292:23-293:5 (Moore, Richards)("Q: And how long do you think it would take typically, for someone to find an

---

[23] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[24] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[25] The McNeills neither stipulate to this fact nor proposes an alternative FOF on this fact, but the Court credits Jenkins' mathematical conclusion of loss; W. McNeill testifies that it would cost $93,600.00 per year to lease alternative grazing land.  See Day 1 Tr. at 121:13-20 (Jenkins, W. McNeill).  Assuming that McNeill leases alternative land, he would have made the same profits he now seeks in damages, minus the amount he has to pay to lease the alternative land.  As a result, the Court concludes that Jenkins is correct in asserting that the McNeills' only damages, if alternative land is leased, would have been $280,800.00, the cost of leasing the alternative land.

alternative . . . . A: Most deals are in tight hands, they're hard to get. They don't swap around much. Q: So it would be difficult to find? A: It would be.").[26]

41.     After November 1st, the first day for grazing under the Purchase Agreement, the McNeills would have been unable to find alternative grazing land and would have been able to place the cows only in a feedyard. See Day 1 Tr. at 178:16-179:4 (Moore, Boyd).[27]

42.     Another alternative to grazing pasture is to put the cows in a feedyard, which is typically more expensive than grazing pastures. See Loewens FOF ¶ 65, at 8; Day 1 Tr. at 293:6-10 (Sterling, Richards).[28]

43.     Because the McNeills do not access the circles for grazing, the McNeills take their calves to South Dakota. See Day 1 Tr. at 43:23-44:1 (Moore, W. McNeill); McNeill FOFs ¶ 17, at 4.[29]

44.     The cost to ship the calves is $18,000.00 for all three years. See Day 1 Tr. at 65:3-5 (W. McNeill); McNeill FOFs ¶ 30, at 8.[30]

---

[26] The parties neither stipulate to nor mutually propose ¶ 40, but the Court credits Richard's testimony on this point, because the record contains no contrary evidence.

[27] The parties neither stipulate to nor mutually propose ¶ 41, but the Court credits Boyd's testimony on this point, because the record contains no contrary evidence.

[28] The McNeills neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits Richard's testimony on this point, because the record contains no contrary evidence.

[29] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

[30] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony on this point, because the record contains no contrary evidence.

45.     For all three years, if the McNeills are able to put the 360 designated cows on the Loewens' land, the McNeills would have bought 360 calves from Superior Livestock to feed in South Dakota, where the McNeills had to put the 360 designated calves, because they did not go on the Loewens' land; essentially, the McNeills would have doubled their cattle. See Day 1 Tr. at 63:18-64:5 (Moore, W. McNeill); McNeill FOFs ¶ 28, at 7.[31]

46.     The McNeills would have incurred some costs to care for the calves they would have put on the Loewens' land, if made available, to look after the calves and pay sales commission.  See McNeill FOFs ¶ 31, at 8; Day 1 Tr. at 74:9-77:13 (Moore, W. McNeill).[32]

47.     For the first two years, the McNeills would have incurred costs of $9,900.00 per year, and the McNeills in the third year would have incurred costs of $12,600.00.  See McNeill FOFs ¶ 31, at 8; Day 1 Tr. at 74:9-77:13 (Moore, W. McNeill).[33]

48.     For each year, the McNeills are charged a commission to sell the cattle; for years one and two of grazing rights, the commission averaged $35.00/head, or $12,600.00 total, and for year three the commission averaged $45.00/head, or $16,200.00 total.  See Day 1 Tr. at 76:19-24 (W. McNeill).[34]

---

[31] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

[32] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

[33] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

[34] The parties neither stipulate to nor mutually propose ¶ 48, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

49.     Cows that the McNeills earmark for the Loewens' property would have gained approximately two pounds per day grazing on the Loewens' land.  See Loewen FOFs ¶ 45, at 5; Day 1 Tr. at 189:9-13 (Moore, Boyd).[35]

50.     In the first year of grazing rights, the McNeills sell their calves for $2.02 per pound, in the second year of grazing rights the McNeills sell their calves for $2.30 per pound, and in the third year of grazing rights the McNeills sell their calves for $2.66 per pound.  See McNeill FOFs ¶ 34, at 8; Day 1 Tr. at 70:4-8 (Moore, W. McNeill).[36]

51.     The McNeills sell the calves that they earmark for the Loewens' land for $290,880.00 the first year of grazing rights, $331,200.00 the second year of grazing rights, and $383,040.00 the third year of grazing rights.  See McNeill FOFs ¶ 35, at 9;  Day 1 Tr. at 72:3-11 (Moore, W. McNeill).[37]

---

[35] The McNeills do not stipulate to this fact.  See McNeill FOF ¶ 32, at 8 ("Cows that the Plaintiffs earmarked for the Loewen's property gained 2.3 pounds per day. . . .").  The Court credits Boyd's testimony regarding the amount of weight his cows gain per day,  see Day 1 Tr. at 189:9-13 (Moore, Boyd)(Q: "Do you know what kind of gains the cows you put out achieved?" A: "Pretty average across the board, over the last ten years, it's been two pounds per head per day."), over W. McNeill's testimony regarding the amount of weight the cows earmarked for the Loewens' property gain per day when selecting an estimate weight gain per day to use for damages, because Boyd  grazes his cattle on land in the same region as the Loewens' property.  His estimate of two pounds per day therefore better estimates the amount of weight cattle would gain per day grazing on the Loewens' land than the McNeills' statement of 2.3 pounds per day, which the cattle gain on a feedyard in South Dakota.  See White Oaks Pasture Team, Cattle Comparison: Pasture-Raised, Grassfed Cattle v. Feedlot, Grain-Finished Cattle,  WHITE OAK PASTURES (Oct. 23, 2020), https://blog.whiteoakpastures.com/blog/cattle-comparison-pasture-raised-grassfed-cattle-vs-feedlot-grain-finished-cattle (explaining that cattle raised in feedlots gain weight faster than pasture fed cattle).  Accordingly, the Court determines that it will use an estimated weight gain of two pounds per day to calculate any available damages.

[36] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

[37] The Loewens neither stipulate to this fact nor propose an alternative FOF on this fact, but the Court credits W. McNeill's testimony, because the record contains no contrary evidence.

52.     If the McNeills are able to put the earmarked 360 calves on the Loewens' land, the McNeills would have purchased 360 additional calves to feed in South Dakota, and would have sold the additional calves for the following price, using a two pound per day weight gain estimate for the entire grazing period results in $241,430.40 for the first year, $274,896.00 for the second year, and $317,923.20 for the third year.[38]

53.     Minus costs and commission, the McNeills could have earned a net profit of $218,930.40 for the first year, $252,396.00 for the second year, and $289,123.20 for the third year. See Day 1 Tr. at 76:10-77:13 (Moore, W. McNeill); Day 1 Tr. at 293:18-298:24 (Richards)(discussing his methods of estimating the McNeills' lost profits for the three years of grazing, and stating that his estimates are "very close" to W. McNeill's total lost profit estimate of $934,020.00 for all three years of grazing rights).[39]

## CONCLUSIONS OF LAW

1.     The Court has subject-matter jurisdiction over this case based upon diversity of the parties and the requisite amount in controversy.

---

[38] In calculating the applicable damages, the Court still uses the price per pound that the McNeills testify they receive in the relevant years for cattle from feedyards. See FOF ¶ 50, at 14. The Court acknowledges that the price per pound would likely be different for pasture grazed cattle than the price per pound for feedyard raised cattle. The McNeills do not provide any evidence of the price per pound for pasture grazed cattle in the relevant years. In the absence of this information, the Court uses the only price per pound available in evidence, even though it might slightly decrease the available damages. The Court could use the weight gain for feedyard cattle, which would be some symmetry, but the Court does not think using two inappropriate variables is better than using one good variable and one less than perfect variable. The McNeills have the burden of proof on damages, and if one party has to bear the problem with the record, it should be the McNeills and not the Loewens.

[39] The parties neither stipulate to nor mutually propose ¶ 53. The Court credits W. McNeill's and Richards' testimony for the method of calculating net profit, however, because the record contains no contrary evidence, and substitutes the pound per day or total pound gain that W. McNeill and Richards use in their damages calculation with Boyd's two pound per day gain estimation.

2.      New Mexico substantive law applies to this case.

3.      The Purchase Agreement is not ambiguous that the Loewens are required to give to the McNeills the right to graze livestock, on three irrigated circles of at least 120 acres of planted and maintained wheat in Lea County, Gaines County, and/or Yoakum County, which the Loewens own, or that any Loewen entity owns, for five years with each year of grazing beginning November 1st and ending April 15th.  See Purchase Agreement ¶ 2, at 1.

4.      At the time of trial, the first three years of grazing had elapsed, and the dispute of those years are the only years ripe for trial and adjudication.  See Order on Waiver MSJ at 2.[40]

5.      The McNeills perform under the Purchase Agreement by conveying the Property in the Purchase Agreement which the McNeills agree to convey.  See FOF ¶ 7, at 3.

6.      The Loewens pay $2,500,000.00 as part of the consideration for the Property under the Purchase Agreement.  See FOF ¶ 8, at 3.

7.      The McNeills are not contractually required under the Purchase Agreement to provide notice to the Loewens of their intent to invoke the Purchase Agreement's grazing rights, and accordingly do not waive their right to the grazing rights for failure to comply with a contractual requirement of notice.  See Order on Waiver MSJ at 15 ("The Court concludes that the McNeills do not waive their rights either to the first or to the second year of grazing rights, however, because the Purchase Agreement does not require the McNeills to give notice of their intent to exercise their grazing rights, and, therefore, the failure to comply with the methods of the notice provision cannot equate to waiver.").

---

[40] In the Order, filed November 26, 2025 (Doc. 84)("Order on Waiver MSJ"), footnote 1 on p. 1 promises a full Memorandum Opinion at a later date.  After reviewing the Order on Waiver MSJ, the Court determines that the Order on Waiver MSJ does not require further analysis, and, the Order on Waiver MSJ constitutes the Court's full Opinion and Order.  The Court will not issue any further opinions on the motions of which the Order on Waiver MSJ rules.

8.      The Purchase Agreement grants the McNeills the "right to graze livestock, at no charge," on the Loewens' land.  Purchase Agreement ¶ 2, at 1.  The Court previously decides that this provision of the contract does not require compliance with the notice provision in the Purchase Agreement ¶ 22, at 6 ("All notice required or permitted by the terms hereof shall be sent to the parties at the addresses set forth below by overnight mail by a nationally recognized delivery company, by personal delivery or email, and such notice shall be deemed received upon personal delivery, 24-hours after delivery to an overnight delivery company or confirmed receipt of email, whichever shall first occur . . . .").  See Order on Waiver MSJ at 15.  This decision does not foreclose, however, the conclusion that the Court makes now, which is that, while the grazing provision gives the McNeills the right to graze on the Loewens' land, the McNeills must take some action to exercise this right.  The Purchase Agreement requires that the Loewens "shall give" the McNeills the right to graze, but this right does not mean that the Loewens are responsible for seeking out the McNeills and bringing their cows to the Loewens' land to graze.  Purchase Agreement ¶ 2, at 1.  All that the Purchase Agreement requires from the Loewens is that they maintain the required land, in the required condition, ready for the McNeills to use should the McNeills choose to exercise their grazing rights.  There are numerous things that a rancher must know before dropping cattle off to graze a property.  See Day 1 Tr. at 179:13-17 (Boyd)("I need to know where it's at, where he wants the fence, what water well he wants me to use to water them, where my electric power source needed to come from, and when they got to be off.");  Day 1 Tr. at 180:13-21 (Moore, Boyd)("Q: Typically, y'all talk, and you know where you're going, he knows when you're coming, he knows when you're setting up; right? A: He knows a general idea of when I'm coming. . . . Q: You don't just, out of the blue, pick up and drop your cows off without him knowing you're coming? A: No, sir.").  The onus is on the McNeills, who have the option to graze their cattle or not, to elect to enforce their grazing rights.  In so doing, the McNeills must make

reasonable efforts to contact the Loewens to determine where the available land is that the cattle may graze. Failure to make such reasonable efforts constitutes a failure to exercise the right to graze so that the McNeills may not recover on such basis.

9.     The McNeills do not make reasonable efforts to exercise their right to graze during the first year of grazing rights. W. McNeill calls W. Loewen before the beginning of the first year of grazing rights as an attempt to get into contact with W. Loewen regarding grazing for the first year under the Purchase Agreement. See FOF ¶ 11, at 4. W. McNeill also checks with a mutual friend to confirm that the telephone number, which he is using to call W. Loewen, is correct. See FOF ¶ 11 n. 10, at 4. W. McNeill does not make any further efforts to get into contact with W. Loewen regarding the first year of grazing rights. See FOF ¶¶ 11 n. 10, 12, at 4. Further, despite being in contact with Boyd, an acquaintance of W. Loewen, W. McNeill does not inquire whether Boyd is able to get into contact with W. Loewen regarding the first year of grazing rights. All of these facts demonstrate to the Court that the McNeills, although they make some effort to exercise their right to graze the first year, do not take the reasonable steps required for a finding in their favor on the first year of grazing rights. The McNeills need to do more: get Boyd to tell W. Loewen that they want to graze; drive out to find W. Loewen; hire an investigator or process server to find him; send W. Loewen an email; look on the internet to locate him; or take modern measures to locate and contact W. Loewen.

10.     The McNeills also do not make reasonable efforts to exercise their right to graze during the second year of grazing rights. After the first year of grazing rights passes, the McNeills acquire counsel, who sends a demand letter to the Loewens via the address that the Loewens provide in the Purchase Agreement. See FOF ¶ 20, at 6. Mail delivery at this address is sometimes unreliable, however, and the mail is returned to sender. See FOF ¶ 22, at 6. The McNeills make no other effort to contact the Loewens during this year. See FOF ¶ 21, at 6. The demand letter is

returned to the McNeills' attorney, not to the McNeills.  See FOF ¶  22, at 6.  The McNeills'

attorney, however, should have realized that the demand letter had not been delivered, and taken

further steps to get in contact with the Loewens regarding the second year of grazing rights.  See

Eastern Colorado Seeds, LLC v. Agrigenetics, Inc., No. 21-1057, 2021 WL 6102097, at * 3 (10th

Cir. Dec. 23, 2021)("But we should not forget the fundamental proposition that the client (the

principal) is responsible for the conduct of counsel (the agent) . . . .").  The McNeills should have

driven out there or retained someone to track down W. Loewen.  The failure to take any further

steps to notify the Loewens of the McNeills' intent to graze for the second year of grazing rights

demonstrate to the Court that the McNeills, although they make some effort to exercise their right

to graze the second year, do not take the reasonable steps necessary for a finding in their favor on

the second year of grazing rights.

11.     For the third year of grazing rights, the Loewens agree to allow the McNeills to

graze on their land pursuant to certain conditions, including requiring that the McNeills pay for

water distribution and utilities associated with the grazing circles.  See FOF ¶¶ 26-27, at 7-8.  The

Purchase Agreement states that the Loewens shall give the right to the McNeills to graze on the

Loewens' land at "no charge" to the McNeills.  Purchase Agreement ¶ 2, at 1.  The Court previously

determines that this contractual term is ambiguous as to which party is responsible for the costs,

such as water and fencing, associated with grazing cattle.

> The Court determines that a reasonable person could interpret the Purchase
> Agreement's language that the grazing rights would be available 'at no charge to
> Seller' to mean either that the Seller, the McNeills, would not have to pay anything
> for the grazing rights, including associated costs, or simply that the McNeills would
> not be charged by the Buyer, the Loewens, for the right to access the grazing lands,
> without reference to whether the McNeills had to cover the associated grazing costs.

Order at 17 (quoting Purchase Agreement ¶ 2, at 1).  Under New Mexico law, once a court finds

ambiguity, the court as the fact finder in the absence of a jury "resolves the ambiguity as an issue

of ultimate fact before deciding issues of breach and damages." C.R. Anthony, 1991-NMSC-070

¶ 17, 112 N.M. at 509, 817 P.2d at 243.

> The question of interpretation of language and conduct (the question of the meaning to be given the words of the contract) is a question of fact where that meaning depends on reasonable but conflicting inferences to be drawn from events occurring or circumstances existing before, during, or after negotiation of the contract.

C.R. Anthony, 1991-NMSC-070 ¶ 17, 112 N.M. at 509, 817 P.2d at 243.  The Court determines

that "at no charge to Seller" prevents the Loewens from charging the McNeills for costs associated

with grazing.  See FOF ¶ 34, at 10.  Accordingly, the Court concludes that the Loewens, in placing

conditions on the McNeills' grazing rights requiring the McNeills to pay for water distribution,

utilities, fencing, and liability insurance, do not give the McNeills the right to graze at no charge

as the Purchase Agreement requires.  The Loewens thus breach the Purchase Agreement's promise

to provide the third year of grazing.  The McNeills, therefore, are entitled to recover damages for

the third year of grazing rights.

12.     New Mexico recognizes special damages in the form of lost profits originating from

the breach of a lease, specifically in the grazing rights context, if the damages: (i) are within the

parties' contemplation at the time they make the agreement; (ii) result directly and proximately

from the breach; and (iii) the plaintiff can establish the damages with reasonable certainty.

> But the special damages which are within the contemplation of the parties and resulting directly and proximately from the breach, are recoverable if they can be established with reasonable certainty.  The parties are shown to be experienced in the cattle business.  They knew range conditions, carrying capacity, and the purpose for which the premises were to be used.  With this knowledge it would seem that the question of profit was clearly within the contemplation of the parties when the lease was made.

Barfield v. Damon, 1952-NMSC-069 ¶ 19, 56 N.M. 515, 523, 245 P.2d 1032, 1037 ("Barfield").

The Court notes that Barfield is not directly on point, because Barfield discusses damages from

the breach of a lease of land for grazing, whereas the current case discusses damages from the

breach of a land sale contract where the Purchase Agreement provides grazing rights as additional consideration for the Property's sale. The Court determines, however, that Barfield provides persuasive authority for the recognition of lost profits damages in this case. Although the damages in this case do not extend from the breach of a lease, the McNeills in effect bargain for the right to lease the Loewens' land as part consideration for the sale of the Property. Accordingly, the Court concludes that it is appropriate to apply the special damages for loss profits from Barfield in this case.

13. The McNeills meet the required elements for Barfield lost profits damages. The Supreme Court of New Mexico in Barfield concludes that the special damages are within the parties' contemplation, because both parties are experienced in the cattle business, and both "knew range conditions, carrying capacity, and the purpose for which the premises were to be used." 1952-NMSC-069 ¶ 19, 56 N.M. at 523, 245 P.2d at 1037. Further, the Supreme Court of New Mexico implicitly finds that the loss of profits from cattle sales are a natural and proximate result of the breach of lease of land for grazing cattle. See 1952-NMSC-069 ¶ 23, 56 N.M. at 524, 245 P.2d at 1037-38 ("On cross-examination he went into detail and fully developed facts from which the jury could readily determine for itself the loss of profits sustained as a natural and proximate result of the breach."). Finally, in Barfield, the Supreme Court of New Mexico determines that the plaintiff establishes damages with reasonable certainty, because the plaintiff's testimony details "the kind and cost of his cattle, the expenses of production, market conditions, and other date from which he estimated his loss," along with supporting testimony estimating the plaintiff's lost profits from both an adjacent land owner -- familiar with the plaintiff's cattle business and market conditions -- and a second witness also engaged in the live stock business. 1952-NMSC-069 ¶ 24, 56 N.M. at 524, 245 P.2d at 1038. The Court concludes that, similar to the plaintiff in Barfield, the McNeills lost profits are within both parties' contemplation when the McNeills and the

Loewens enter into the Purchase Agreement.  Although the Loewens are farmers and not ranchers, the Loewens are aware that the McNeills are ranchers and that the purpose for which the McNeills ask for grazing rights is to graze cattle for their ranching business.  See Purchase Agreement ¶ 2, at 1.  Further, the Court concludes that the Loewens are sufficiently familiar with the ranching business to be aware of the McNeills' potential lost profits if the McNeills cannot graze on the Loewens' land, because of the Loewens' past experiences leasing out their land to other ranchers, specifically Boyd, for grazing.  See FOF ¶ 17, at 5 (explaining that Boyd has put cattle on W. Loewen's property several times in the approximately fifteen years he has known the Loewens). The Court next concludes that, as Barfield establishes, the McNeills' lost profits from cattle sales are a natural and proximate result of the Loewens' breach of the contract -- denying the McNeills access to the third year of grazing rights.  Finally, similar to the testimony in Barfield, the testimony at trial regarding the McNeills' lost profits is sufficient to establish the McNeills' damages with reasonable certainty.  Like the plaintiff's testimony in Barfield regarding his cattle business, McNeill testifies to the number of calves he intends to graze on the Loewens' land, the costs he would incur to care for the calves and pay sales commission, an approximate weight gain for the cattle based on weight gain of cattle that the McNeills keep in South Dakota, and the price per pound which the McNeills sell other cattle for in the relevant years.  See FOF ¶¶ 45-50, at 13-14. Additionally, similar to the testimony in Barfield, which the testimony of additional witnesses supports, the testimony of the expert witness, Richards, a financial expert in the cattle industry, who creates a lost profits estimate substantially similar to W. McNeill's calculations, supports W. McNeill's estimations.  See FOF ¶ 53, at 15.  The Court determines that the testimony in this case is sufficient to establish the McNeills' lost profits with reasonable certainty, and, concluding that all three required elements of the Barfield loss profit damages are present, the McNeills are entitled

to damages of $289,123.20 for the third year of grazing rights, which is the total of their lost profits for the year.

14.    The Loewens assert several affirmative defenses in their Answer: (i) unclean hands; (ii) conditions precedent; (iii) duty to mitigate; (iv) statute of frauds; (v) estoppel; (vi) laches; (vii) vagueness; (viii) abandonment; (ix) waiver; (x) ambiguity.  See Defendants' Original Answer, ¶ 21, at 3, filed January 31, 2024 (Doc. 4)("Answer").  The Loewens do not fail to plead these affirmative defenses such that the Court may not consider them now solely because the Loewens do not file another answer to the McNeills' First Amended Original Complaint, filed September 11, 2024 (Doc. 25), when the Amended Complaint is substantively similar to the original Complaint.  This conclusion flows from the rule that, "[w]hen a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with rule 8(c) does not cause the plaintiff any prejudice."  Creative Consumer Concepts, Inc., v. Kreisler, 563 F.3d 1070, 1076 (10th Cir. 2009)(quoting Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988)).  "And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to continue to hear evidence on the issue."  Creative Consumer Concepts, Inc. v. Kreisler, 563 F.3d at 1076 (quoting Hassan v. U.S. Postal Serv., 842 F.2d at 263).  The Loewens maintain the same affirmative defenses throughout the case as they raise in their Answer.  The Court therefore determines that the McNeills are on notice of these affirmative defenses before trial and that any deficiency in the Loewens' pleading does not prejudice the McNeills.  Accordingly, the Court considers the Loewens' affirmative defenses.

15.    The affirmative defense of unclean hands does not apply here.  The doctrine of unclean hands generally prevents a complainant from recovering where he or she "has been guilty of fraudulent, illegal or inequitable conduct in the matter with relation to which he [or she] seeks relief."  Home Sav. & Loan Ass'n v. Bates, 1966-NMSC-167, ¶ 10, 76 N.M. 660, 662, 417 P.2d

798, 799.  The Court concludes that the McNeills do not engage in any fraudulent, illegal, or inequitable conduct with regards to the grazing rights under the Purchase Agreement.  That the McNeills do not put enough effort into contacting the Loewens regarding the grazing rights, while perhaps relevant to the McNeills' ability to recover, does not support the defense of unclean hands.  See Day 2 Tr. at 401:12-18 (Jenkins)("You've heard testimony that Mr. McNeill claims he tried to call.  Doesn't have any phone records of it, doesn't have any emails, doesn't have any text messages; had the ability to get in touch with Mr. Seth Boyd, who had no problems going in touch with Mr. Loewen . . . .").  Similarly, the fact that the McNeills do not take steps to obtain alternative grazing opportunities, while relevant to the duty to mitigate, does not support the defense of unclean hands.  See Day 2 Tr. at 401:18-21 ("[A]nd then laid behind the log and waited, and is now claiming almost a million dollars in damages for something that he valued at $120,000 a year when he sold the property.").  Accordingly, the Court concludes that the defense of unclean hands is not applicable in this case.

16.    The affirmative defense of conditions precedent does not apply here.  Under New Mexico law, if a contract contains a condition precedent to performance, the right to enforce the contract does not arise until the condition precedent has been fulfilled.  See W. Com. Bank v. Gillespie, 1989-NMSC-046, ¶ 4, 108 N.M. 535, 537, 775 P.2d 737, 739 ("Generally, a condition precedent is an event occurring subsequently to the formation of a valid contract, an event that must occur before there is a right to an immediate performance, before there is breach of a contractual duty, and before the usual judicial remedies are available.").  The Loewens argue that the granting of the grazing right under the Purchase Agreement is akin to an options contract, and that, "without the exercise of that option, it becomes a fact of the waiver, which is the defense that we've pled and alleged," arguing that the option in the contract is the choice of up to three circles for grazing under the Purchase Agreement.  Day 2 Tr. at 402:5-17 (Jenkins).  The Court does not

- 24 -

agree that the choice of circles under the Purchase Agreement is a condition precedent such that failure to elect a number of circles waives the right to enforce the contract. A party must perform a condition to create in the other party the duty to perform. Under the Purchase Agreement, however, the McNeills are entitled to "up to three circles" for grazing; the McNeills may elect to use less than three circles, but the Loewens must provide three circles to graze. Nothing in the contract makes explicit that the McNeills must notify the Loewens of their choice of number of circles before the McNeills' enforce their right to graze, and, in fact, the Loewens prepare three circles for the McNeills without hearing from the McNeills at least for the first year of grazing rights under the Purchase Agreement. See FOF ¶ 14, at 4. Accordingly, the Court determines that the McNeills' failure to notify the Loewens of the number of grazing circles which the McNeills want to use does not waive the McNeills' right to graze under the Purchase Agreement.

17.    The affirmative defense of the duty to mitigate damages does apply here. There is a general duty to mitigate damages in New Mexico. See Elephant Butte Resort Marina, Inc. v. Wooldridge, 1985-NMSC-014, ¶ 34, 102 N.M. 286, 292, 694 P.2d 1351, 1357 ("The law in New Mexico is clear that in a breach of contract, the non-defaulting party has a duty to use 'reasonable diligence' to mitigate damages."). The loss profit damages that Barfield establishes, applicable in this case, closely resemble those available under the UCC lost volume seller doctrine.

> If the measure of damages provided in Subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article, less due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

N. M. STAT. ANN. § 55-2-708(2) (1978); Bill's Coal Co. v. Bd. of Pub. Utilities of Springfield, Mo., 887 F.2d 242, 245 (10th Cir. 1989), holding modified by Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency, 123 F.3d 1351 (10th Cir. 1997)("Bill's Coal")("Section 2-708(2) is basically

designed for specific categories of sellers, such as lost volume sellers, component sellers, and jobber sellers."). Mitigation of lost profit damages is not a prerequisite under the lost volume seller doctrine, because resale does not reduce a lost volume seller's damages given that the breach still results in the plaintiff losing one sale and a corresponding profit. See 24 Williston on Contracts § 64:32 (4th ed.). The Court determines, however, that the lost volume seller doctrine is distinct from the lost profit damages available in this case such that the Court does not consider the lost volume seller doctrine under the UCC persuasive authority and concludes that the duty to mitigate still exists in this case. A lost volume seller is a business or individual who, when a buyer breaches a contract, can still sell goods to another customer without losing the opportunity for the original sale. See Bill's Coal, 887 F.2d at 245 ("A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity."). Importantly, under the lost volume seller doctrine, the breach occurs when a buyer backs out of a contracted sale, and the potential mitigation stems from finding another buyer. Here, by contrast, the breach does not occur from a buyer backing out from a sale, but instead from the Loewens' failure to give the McNeills the right to graze cattle on land. Had the McNeills been able to graze, the McNeills would have been able to raise cattle and double the number of cattle they had available for sale. Accordingly, unlike under the lost volume seller doctrine, where mitigation is ineffectual because solely finding another buyer does not replace the other potential lost profits, mitigation here would be effectual in allowing the McNeills to obtain the potential lost profits. If the McNeills had been able to acquire alternative grazing lands, the McNeills would have been able to raise double the cattle and acquire the profits from the sale of this extra cattle, thereby effectively mitigating their damages. Because mitigation of damages is effective in this case, the Court declines to find the lost volume seller doctrine to be persuasive authority and determines that the McNeills are under a duty to mitigate in this case. See Sturgeon

v. Phifer, 390 P.2d 727, 730-31 (Wyo. 1964)(discussing the application of mitigation for damages in a case stemming from a breach of contract for sheep grazing); State v. Harrell Ranch, Ltd., 268 S.W.3d 247, 255 (Tex. App. 2008)(concluding that the ranch undertook reasonable mitigation efforts after the State of Texas temporarily impaired access to a portion of the property, and the ranch claimed lost profits from its cattle ranch business).

18. Mitigation of damages is required only to the extent that the injured party "undertake ordinary or reasonable measures to mitigate damages." Lovelace Med. Ctr. v. Mendez, 1991-NMSC-002, 111 N.M. 336, 353, 805 P.2d 603, 620. Accordingly, the McNeills fail to mitigate their damages only if it is reasonable for them to mitigate. The burden, however, is on the defendant to successfully plead mitigation and to produce competent evidence showing what amount the plaintiff could have realized through reasonable effort. See Fed. Rsrv. Bank of Dallas v. Upton, 1930-NMSC-012, ¶ 20, 34 N.M. 509, 285 P. 494, 496. The McNeills do not seek alternative grazing pastures at any point during the first year of grazing rights, the second year of grazing rights, or the third year of grazing rights. See FOF ¶ 38, at 11. The Loewens, however, do not introduce any evidence that alternative grazing pastures, within the same counties to which the parties agree under the Purchase Agreement, are available for the McNeills to lease. To the contrary, the McNeills introduce evidence that it would be very difficult, if not impossible, for the McNeills to acquire alternative grazing land. See FOF ¶ 40, at 11-12 ("It is difficult to obtain alternative grazing pastures."); FOF ¶ 41, at 12 ("After November 1st, the first day of grazing under the Purchase Agreement, the McNeills would have been unable to find alternative grazing land, and would only have been able to place the cows in a feedyard."). The Loewens do provide, however, testimony regarding the cost to obtain alternative grazing pasture. See FOF ¶ 39, at 11 ("Had the McNeills been able to obtain alternative grazing pasture, it would have cost $0.65 per pound of gain, which would have lowered the McNeills total loss to $280,800.00 for the three

years"). There is testimony that feedyards are another alternative to pastures for grazing. See FOF ¶ 42, at 12 ("Another alternative to grazing pasture is to put the cows in a feedyard, which is typically more expensive than grazing pastures."). The Loewens do not introduce any testimony, however, that feedyards are available to the McNeills as a reasonable alternative, introducing neither testimony regarding the feasibility of procuring space in a feedyard during the relevant grazing periods nor testimony regarding the cost of raising cattle in a feedyard. The Court accordingly determines that the Loewens do not produce competent evidence showing what amount of profit the McNeills could have realized through competent effort. First, the Loewens do not establish that the McNeills could have obtained either alternative grazing pasture or feedyard space for the intended cattle through "ordinary or reasonable measures." Lovelace Med. Ctr. v. Mendez, 1991-NMSC-002, 111 N.M. at 353, 805 P.2d at 620. Second, with regards to the feedyard, the Loewens do not provide any estimate cost for renting the feedyards, which prevents the Court from calculating what amount of profit the McNeills could have obtained through reasonable effort to obtain the feedyard alternative. In summary, the Court concludes that the Loewens do not meet their burden of proving the duty to mitigate, and accordingly the Court does not lower the McNeills' damages because of the duty to mitigate.

19.    The affirmative defense of the statute of frauds does not apply here. The statute of frauds bars the enforceability of oral contracts. See Jennings v. Ruidoso Racing Ass'n, 1968-NMSC-081, ¶ 4, 79 N.M. 144, 146, 441 P.2d 42, 44. The Loewens make no argument regarding this defense at trial, and assert only that, "pursuant to the purchase agreement for the McNeill Farm, the alleged grazing rights violate the statute of frauds and are thus unenforceable" in their Answer. See Answer ¶ 21(d), at 3. The Purchase Agreement, including the provision which establishes the grazing rights, is a written contract. See Purchase Agreement ¶ 2, at 1. Accordingly, the defense of statute of frauds does not bar the McNeills' claims.

20.     The affirmative defense of estoppel does not apply here.  "[E]stoppel is the preclusion, by acts or conduct, from asserting a right which might otherwise have existed, to the detriment and prejudice of another, who, in reliance on such acts and conduct, has acted thereon." Waters-Haskins v. New Mexico Hum. Servs. Dep't, Income Support Div., 2009-NMSC-031, ¶ 15, 146 N.M. 391, 396, 210 P.3d 817, 822.  The Loewens argue that "when a party does nothing; lays back; tries to then come in and claim a million dollars on something they valued $120,000 a year, that's exactly the scenario that estoppel is designed to avoid."  Day 2 Tr. at 402:18-22 (Jenkins). The Court determines that estoppel is not appliable in this case; the Loewens do not take any action in reliance on the McNeill's actions to their prejudice as the defense of estoppel requires. Accordingly, the defense of estoppel does not bar the McNeills' claims.

21.     The affirmative defense of laches does not apply here.  "Laches focuses on the conduct of the party to be estopped, so that the trial court can evaluate whether that party's unreasonable delay in raising the claim has prejudiced the defendant."  Brown v. Taylor, 1995-NMSC-050, ¶ 12, 120 N.M. 302, 306, 901 P.2d 720, 724.  "[T]he party asserting the defense must demonstrate prejudice, and for such purposes, 'prejudice cannot be inferred merely from the passage of time.'"  Brown v. Taylor, 1995-NMSC-050, ¶ 12, 120 N.M. at 306, 901 P.2d at 724. The Court determines that the McNeills do not engage in unreasonable delay in bringing this suit; after the first year of grazing rights pass, before the second year of grazing rights concludes, the McNeills file the lawsuit to enforce their grazing rights.  See FOF ¶ 24, at 7 ("After the McNeills do not graze for the first two years, the McNeills file their lawsuit in federal court on January 10, 2024.").  The Court concludes that this timeline does not constitute unreasonable delay.  The McNeills file suit after the first year of grazing rights end but before the close of the second year of grazing rights, only after acquiring counsel, and the Loewens still do not allow the McNeills to exercise their grazing rights. Bringing suit after failure to acquire the grazing rights with the

assistance of counsel falls within a reasonable time to bring suit.  Without unreasonable delay, the

Loewens do not satisfy the defense of laches, and, accordingly, the defense of laches does not bar

the McNeills' claims.

22.     The affirmative defenses of vagueness and ambiguity do not apply here.

> 'A court cannot enforce a contract unless it can determine what it is . . . . It is not even enough that they have actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are.  Vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract.'

Hyder v. Brenton, 1979-NMCA-076, ¶ 31, 93 N.M. 378, 384, 600 P.2d 830, 836 (Walters, J.

concurring in part)(quoting 1 A. Corbin, Contracts § 143 (Revised ed. 1963)).[41]  See Las Cruces

Urb. Renewal Agency v. El Paso Elec. Co., 1974-NMSC-004, ¶ 12, 86 N.M. 305, 308, 523 P.2d

549, 552 ("Considered as a contractual provision to be construed as written, we agree with the trial

court that § 9 is so vague, indefinite and ambiguous as to be unenforceable.").  While, however, "a

contract to convey real estate must be definite and certain before it will be enforced, absolute

certainty in a contract is not required . . . reasonable certainty is all that is required."  Whatley v.

Colcott, 1956-NMSC-100, ¶ 6, 61 N.M. 455, 458, 302 P.2d 514, 515.   "The test of 'reasonable

certainty' is set forth in Restatement § 33(2): 'The terms of a contract are reasonably certain if they

provide a basis for determining the existence of a breach and for giving an appropriate remedy.'"

Padilla v. RRA, Inc., 1997-NMCA-104, ¶ 8, 124 N.M. 111, 114, 946 P.2d 1122, 1125 (quoting

Restatement (Second) of Contracts § 33(2) (1981)).[42]  The Loewens argue that the grazing rights

---

[41] The Court predicts that the Supreme Court of New Mexico would agree with Hyder v. Brenton, because the New Mexico Court of Appeals merely expands upon the principle regarding vagueness and ambiguity stated by the Supreme Court of New Mexico in Las Cruces Urb. Renewal Agency v. El Paso Elec. Co., 1974-NMSC-004, ¶ 12, 86 N.M. 305, 308, 523 P.2d 549, 552.

[42] The Court predicts that the Supreme Court of New Mexico would rely on the definition of "reasonable certainty" as provided in the Second Restatement of Contracts, therefore adopting

provision is both too vague and too ambiguous for the Court to enforce it, asserting specifically with regards to ambiguity that the Court cannot enforce the provision because "it fails to describe the specific property with anything other than a county which cannot be ascertained by the terms of the contract the subject of this suit." Answer ¶ 21(j), at 4. The Court concludes that the grazing rights provision's essential terms are present such that the Court can enforce the provision. The grazing rights provision establishes what rights the parties are exchanging: the Loewens convey to the McNeills the right to graze on up to three circles of irrigated wheat in exchange for part of the purchase price for the Property. See Purchase Agreement ¶ 2, at 1. The provision also identifies these rights' timeframe: "November 1 to April 15 of each year for five years after the close of this transaction." Purchase Agreement ¶ 2, at 1. Finally, the provision identifies an estimated location where the grazing rights must be, stating that the land must be in "Lea County, New Mexico, Gaines County, Texas and/or Yoakum County, Texas." Purchase Agreement ¶ 2, at 1. The Court concludes that, from these terms, the Court can determine what the agreement's terms are, determine the existence of a breach, and an appropriate remedy. That the provision does not lay out explicitly every detail of the grazing rights does not prevent the Court from enforcing the provision; "reasonable certainty" is all that New Mexico law requires, and the Court determines that reasonable certainty exists here. Whatley v. Colcott, 1956-NMSC-100, ¶ 6, 61 N.M. at 458, 302 P.2d at 515. Accordingly, the defenses of vagueness and ambiguity do not bar the McNeills' claims.

---

the conclusion of law stated in Padilla v. RRA, Inc., 1997-NMCA-104, ¶ 8, 124 N.M. at 114, 946 P.2d at 1125, because the New Mexico Supreme Court consistently cites and uses Restatement (Second) of Contracts. See, e.g., Romero v. Earl, 1991-NMSC-042, ¶ 6, 111 N.M. 789, 791, 810 P.2d 808, 810 (quoting the Restatement (Second) of Contracts §§ 71, 79 for the definition of consideration).

23.     The affirmative defense of abandonment does not apply here.  A contract is abandoned "where the acts of one party inconsistent with its existence are acquiesced in by the other party."  Keeth Gas Co. v. Jackson Creek Cattle Co., 1977-NMSC-087, ¶ 16, 91 N.M. 87, 91, 570 P.2d 918, 922.  The McNeills' actions are not inconsistent with the existence of the grazing rights provision.  Although the Court determines above that the McNeills' actions in both the first and the second years of grazing rights are not sufficient to exercise the McNeills' grazing rights, the McNeills make at least some effort to exercise their grazing rights.  During the first year, W. McNeill calls W. Loewen at least once to attempt to exercise the grazing rights, and, during the second year, the McNeills acquire representation who sends a demand letter to the Loewens in an attempt to exercise the grazing rights.  See FOF ¶¶ 11, 20, at 4, 6.  These actions are not inconsistent with the contract's existence and demonstrate the McNeills' continued desire to enforce the grazing rights provision.  Accordingly, the defense of abandonment does not apply and does not bar the McNeills' claims.

24.     The affirmative defense of waiver does not apply here.  "Generally, New Mexico cases have defined waiver as the intentional relinquishment or abandonment of a known right."  J.R. Hale Contracting Co. v. United New Mexico Bank at Albuquerque, 1990-NMSC-089, ¶ 11, 110 N.M. 712, 716, 799 P.2d 581, 585 ("J.R. Hale").  New Mexico also recognizes implied waiver, often referred to as waiver by estoppel.   See J.R. Hale, 1990-NMSC-089, ¶ 11, 110 N.M. at 717, 799 P.2d at 586.  "To prove waiver by estoppel the party need only show that he was misled to his prejudice by the conduct of the other party into he honest and reasonable belief that such waiver was intended."  J.R. Hale, 1990-NMSC-089, ¶ 12, 110 N.M. at 717, 799 P.2d at 586.   The Court determines that the McNeills do not waive, either intentionally or implicitly, their rights under the Purchase Agreement grazing provision.  There is no evidence to support a conclusion that the McNeills intentionally waive their rights under the Purchase Agreement; the McNeills make at

least some attempt each relevant year to access their grazing rights. See FOF ¶¶ 11, 20, at 4, 6. The Court also concludes that the McNeills do not implicitly waive, waive by estoppel, their grazing rights under the Purchase Agreement. Even if the Loewens prove that the McNeills misled them into a reasonable belief that the McNeills waive their grazing rights, the Loewens do not demonstrate any prejudice which stems from this belief sufficient to support a claim of waiver by estoppel. The Court can see only benefits which the Loewens obtain had the Loewens reasonably believed that the McNeills intend to waive their rights under the Purchase Agreement; if the Loewens believe that the McNeills do not intend to enforce their grazing rights, the Loewens are able either to seek out alternative ranchers to graze on the land, from which they will obtain some payment, or to use the land for alternative purposes. In the absence of any demonstrative prejudice from an assumed honest and reasonable belief on the Loewens' part that the McNeills are not enforcing their grazing rights, the defense of waiver by estoppel does not apply in this case. Accordingly, the defense of waiver does not apply to bar the McNeills' claims.

25.    The Purchase Agreement entitles the prevailing party in any legal action stemming from the contract to recover "reasonable attorneys' fees and expenses and costs of court incurred. . . . includ[ing], without limitation, paralegal fees, investigative fees, expert witness fees, administrative costs, all New Mexico gross receipts taxes applicable to same, and all other charges billed by the attorneys' to the prevailing party." Purchase Agreement ¶ 24, at 6. Section 1983 "and its fee-shifting provision, 42 U.S.C. § 1988, seek to encourage attorneys to litigate civil rights violations." Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *13 (D.N.M. June 13, 2012)(Browning, J.). Section 1988(b) provides: "[T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). "[T]here are two elements in deciding whether to award attorney's fees. First, the party seeking fees must qualify as a 'prevailing party.' Second, the fee

itself must be 'reasonable.'"  Phelps v. Hamilton, 120 F.3d 1126, 1129 (10th Cir. 1997)(quoting 42 U.S.C. § 1988(b)).

For the purpose of determining attorney's fees, a court may determine that plaintiffs are "prevailing parties . . . if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  Hensley v. Eckerhart, 461 U.S. at 433 (internal quotation marks omitted)(citation omitted).  In Farrar v. Hobby, 506 U.S. 103 (1992), the Supreme Court of the United States later elaborates on this description:

> Therefore, to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.  The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.  Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement.  Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff.  Only under these circumstances can civil rights litigation effect the material alteration of the legal relationship of the parties and thereby transform the plaintiff into a prevailing party.  In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

506 U.S. at 111 (citations omitted)(internal quotation marks omitted)(alterations omitted).  The Supreme Court has stated that "this is a generous formulation that brings the plaintiff only across the statutory threshold."  Hensley v. Eckerhart, 461 U.S. at 433.  See Copar Pumice Co., Inc. v. Morris, 2012 WL 2383667, at *19 (concluding that Copar Pumice qualified as a prevailing party under the "generous formulation" that the Supreme Court set in Hensley v. Eckerhart).  The district court must then determine what fee is "reasonable."  Hensley v. Eckerhart, 461 U.S. at 433; Obenauf v. Frontier Fin. Grp., Inc., 785 F. Supp. 2d 1188, 1210 (D.N.M. 2011)(Browning, J.)("Once a court determines that a party is a prevailing party, it must then determine what amount of reasonable attorney's fees should be awarded.").

"To determine a reasonable attorneys fee, the district court must arrive at a 'lodestar' figure by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable

- 34 -

hourly rate." Jane L. v. Bangerter, 61 F.3d 1505, 1509 (10th Cir. 1995)(citing Blum v. Stenson, 465 U.S. at 888; Hensley v. Eckerhart, 461 U.S. at 433). This lodestar figure "provides an objective basis on which to make an initial estimate of the value" of an attorney's services. Hensley v. Eckerhart, 461 U.S. at 433. While the Court "agrees that attorneys' fees should be adequate to attract competent counsel," they should "not be so large that it is a windfall for attorneys -- who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." Obenauf v. Frontier Financial Group, Inc., 785 F. Supp. 2d at 1214. The prevailing party requesting an award of its fees must submit evidence to support its claim of time spent and rates sought. See Hensley v. Eckerhart, 461 U.S. at 434. If the evidence is inadequate, the district court may reduce the fee award accordingly. See Hensley v. Eckerhart, 461 U.S. at 434. See also Ysasi v. Brown, 2015 WL 403930, at *14 (reducing the plaintiffs' counsel's requested fees because the time records were of poor quality, lacked detail, and were general in their wording).

A district court may also adjust the lodestar to reflect a plaintiff's overall success level. See Jane L. v. Bangerter, 61 F.3d at 1511 (citing Hensley v. Eckerhart, 461 U.S. at 435-36). "In making such adjustments, however, Hensley requires that lower courts make qualitative comparisons among substantive claims before adjusting the lodestar either for excellent results or limited success." Jane L. v. Bangerter, 61 F.3d at 1511. The district court must consider the relationship between the fees awarded and the degree of success obtained and must make a qualitative assessment to determine when limited results will nonetheless justify full recovery or to what extent a plaintiff's "limited success" should reduce the lodestar. Jane L. v. Bangerter, 61 F.3d at 1511. "There is no precise rule or formula" for making such determinations. Hensley v. Eckerhart, 461 U.S. at 436. In Hensley v. Eckerhart, the Supreme Court explained the rationale behind this approach:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

461 U.S. at 435.

Furthermore, when a plaintiff brings related claims, failure on some claims should not preclude full recovery if the plaintiff achieves success on a significant, interrelated claim.  See Hensley v. Eckerhart, 461 U.S. at 440 ("Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."); Jane L. v. Bangerter, 61 F.3d at 1512.  Claims are related when they are either based on "a common core of facts" or based on "related legal theories." Hensley v. Eckerhart, 461 U.S. at 435.  In both cases, the district court should refrain from reducing the amount of the prevailing party's attorney's fee award.  See Jane L. v. Bangerter, 61 F.3d at 1512.  The Tenth Circuit has "refused to permit the reduction of an attorneys fee request if successful and unsuccessful claims are based on a common core of facts." Jane L. v. Bangerter, 61 F.3d at 1512 (internal quotation marks omitted)(quoting Tidwell v. Fort Howard Corp., 989 F.2d 406, 412-13 (10th Cir. 1993)(holding that the trial court abused its discretion in reducing attorney's fees for a plaintiff who prevailed under some provisions of the Equal Pay Act, but failed on her Title VII and state law claims)).  The Tenth Circuit has also recognized that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee." Jane L. v. Bangerter, 61 F.3d at 1512 (quoting Hensley v. Eckerhart, 461 U.S. at 435).

The Court determines that the definition of prevailing party under 42 U.S.C. § 1988 does not apply to this case.  Under New Mexico law, "'at the end of the entire action, the prevailing party is the party who wins on the merits or on the main issue of the case.'"  Fort Knox Self

Storage, Inc. v. W. Techs., Inc., 2006-NMCA-096, ¶ 34, 140 N.M. 233, 241, 142 P.3d 1, 9, as corrected (Aug. 29, 2006)("Fort Knox Self Storage")(quoting Hedicke v. Gunville, 2003-NMCA-032, ¶ 26, 133 N.M. 335, 342, 62 P.3d 1217, 1224)("Hedicke").[43]  See Dunleavy v. Miller, 1993-NMSC-059, ¶ 28, 116 N.M. 353, 360, 862 P.2d 1212, 1219 ("The prevailing party is the party who wins the lawsuit -- that is, a plaintiff who recovers a judgment or a defendant who avoids an adverse judgment.").  "This is so even if the party does not prevail 'to the extent of his original contention.'"  Fort Knox Self Storage, 2006-NMCA-096, ¶ 34, 140 N.M. at 241, 142 P.3d at 9 (quoting Hedicke, 2003-NMCA-032, ¶ 26, 133 N.M. at 342, 62 P.3d at 1224).  In a suit involving multiple claims, however, "'if each party prevails on [some] claim[s] and loses on [others], the trial court . . . may conclude that neither is ultimately a prevailing party."  White v. Farris, 2021-NMCA-014, ¶ 55, 485 P.3d 791, 811.[44]  New Mexico law reflects a higher bar of success required for a party to obtain attorney's fees as a prevailing party than under § 1988.  This higher bar makes sense; § 1988 is a fee-shifting statute which seeks "to encourage attorneys to litigate civil rights violations."  Copar Pumice Co. v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *13. The prevailing party doctrine under § 1988 intends to incentivize attorneys to bring litigation important to the public by allowing them to recover fees with a case that is meritorious in any way. By contrast, New Mexico law defining prevailing party under a contractual fee-shifting provision does not have the same policy considerations to lower the bar of what is required to be considered

---

[43] The Court predicts that the Supreme Court of New Mexico would agree with Fort Knox Self Storage, because the Court of Appeals of New Mexico merely expands upon the principle regarding prevailing parties that the Supreme Court of New Mexico states in Dunleavy v. Miller, 1993-NMSC-059, ¶ 28, 116 N.M. 353, 360, 862 P.2d 1212, 1219.

[44] The Court predicts that the Supreme Court of New Mexico would agree with White v. Farris, because the Supreme Court of New Mexico, in New Mexico Right to Choose/NARAL v. Johnson, 1999-NMSC-028, 127 N.M. 654, 986 P.2d 450, determines that neither party is the prevailing party with regards to a cross-appeal because each party wins on one issue on the cross-appeal.

a prevailing party, and the case law makes clear that a party must "win the lawsuit" to be considered a prevailing party; this standard is different from the requirement that a plaintiff only "obtain at least some relief" to be a prevailing party under § 1988. A contractual fee-shifting provision is an exception to the American Rule, which does not award fees to a prevailing party. The parties are free to write the contractual fee-shifting provision any way they want, and can make it generous to the prevailing party. But if they do not define prevailing party, New Mexico law provides an off-the-shelf definition that is not as generous as under § 1988, but more accurately reflects what contracting parties mean by prevailing party. The Court therefore looks at the entirety of this case to determine if either party has won the lawsuit such that they are entitled to attorney's fees under the contract. The lawsuit centers around the McNeills' breach of contract claim stemming from the McNeills' inability to graze under the Purchase Agreement's grazing rights provision. The McNeills bring this claim for five years under the Purchase Agreement: the first year of grazing rights, the second year of grazing rights, the third year of grazing rights, the fourth year of grazing rights, and the fifth year of grazing rights. The Court dismisses the last two years of grazing rights as not ripe for adjudication in the Order on Waiver MSJ ruling on the Loewens' Motion for Summary Judgment on Waiver and Avoidable Consequences, filed May 2, 2025 (Doc. 47). See Order on Waiver MSJ at 2. The Court concludes that the Loewens are not liable for breach of contract for the first and second years of the grazing rights. The Court determines, however, that the McNeills are liable for the breach of contract for the third year of grazing rights, and the Court concludes that the McNeills are entitled to full damages for this year; none of the Loewens' affirmative defenses succeed. Further, the Loewens bring counterclaims against the McNeills claiming breach of contract, breach of the covenants in the special warranty deed, and negligent misrepresentation, stemming from an alleged failure of the McNeills to convey water rights along with the Property as contracted under the Purchase Agreement. See Defendants' Original

Counterclaim, filed March 7, 2025 (Doc. 35).   The Court dismisses all of the Loewens'
counterclaims; the Court dismisses the breach of contract and negligent misrepresentation
counterclaims in an Order addressing the McNeills' Motion for Summary Judgment on All
Counterclaims of Defendants/Counter-Plaintiffs, filed October 17, 2025 (Doc. 68), see Order, at
2-3, filed December 1, 2025 (Doc. 85)("Order on Counterclaims MSJ"),[45] and dismisses the
remaining claim for breach of the covenants in the special warranty deed in an Order responding
to the McNeills' Request for the Court to Take Judicial Notice and Motion to Dismiss
Defendants/Counter-Plaintiffs' Counterclaim for Lack of Jurisdiction, filed December 3, 2025
(Doc. 88), see Order, at 1, filed December 8, 2025 (Doc. 93)("Order on MTD").[46]  The Court
concludes, looking at the case's outcome, that no party wins the lawsuit such that they are the
prevailing party, and, accordingly, no party is entitled to attorneys fees and costs.  The McNeills
file a claim for damages on five separate years and recover on only one year.  The Loewens file
three counterclaims, and the Court dismisses them all.  Neither party demonstrates the majority of
success in this case necessary to be a prevailing party under the contractual fee-shifting provision.
Accordingly, the Court determines that each party shall bear his or her own attorney's fees and
costs.

---

[45] In the Order, filed December 1, 2025 (Doc. 85)("Order on Counterclaims MSJ"), footnote 1 on p. 1 promises a full Memorandum Opinion at a later date.  After reviewing the Order on Counterclaims MSJ, the Court determines that the Order on Counterclaims MSJ does not require further analysis, and, the Order on Counterclaims MSJ constitutes the Court's full Opinion and Order.  The Court will not issue any further opinions on the motions of which the Order on Counterclaims MSJ rules.

[46] In the Order, filed December 8, 2025 (Doc. 93)("Order on MTD"), footnote 1 on p. 1 promises a full Memorandum Opinion at a later date.  After reviewing the Order on MTD, the Court determines that the Order on MTD does not require further analysis, and, the Order on MTD constitutes the Court's full Opinion and Order.  The Court will not issue any further opinions on the motions of which the Order on MTD rules.

26.     New Mexico affords two different statutory pre-judgment interests: one as of right and one discretionary.  Under § 56-8-3, a party is entitled to pre-judgment interest on: (i) "money due by contract"; (ii)  "money received to the use of another and retained without the owner's consent express or implied"; and (iii) "money due upon the settlement of matured accounts from the day the balance is ascertained."  N.M. STAT. ANN. § 56-8-3 (1978).  Under § 56-8-4(B), "the court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant" after considering the following factors: (i) "if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims"; and (ii) "if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff."  N.M. STAT. ANN. § 56-8-4(B) (1978).  Section 56-8-3, mandatory pre-judgment interest, does not apply in this case. The Court, therefore, considers in its discretion whether to award pre-judgment interest and determines that an award of five percent of pre-judgment interest is appropriate here. Discretionary pre-judgment interest's purpose under § 56-8-4(B) is to "foster settlement and prevent delay."  Lucero v. Aladdin Beauty Colleges, Inc., 1994-NMSC-022, ¶ 10, 117 N.M. 269, 272, 871 P.2d 365, 368.  The parties do not introduce any facts in support or against the award of pre-judgment interest.  There is, accordingly, no evidence that either the McNeills or the Loewens contribute to the delay of the case.  That there is no evidence showing that the Loewens engage in dilatory practices to delay the case supports the denial of an award of prejudgment interest.  See Abeita v. Northern Rio Arriba Electric Cooperative, 1997-NMCA-097, ¶ 45, 124 N.M. 97, 110-11, 946 P.2d 1108, 1121-22 (affirming the trial court's determination not to award prejudgment interest, because the defendant is not the source of unreasonable delay, and that difficult legal issues preclude settlement, meaning that an award of pre-judgment interest does not further the statute's purpose); Bird v. State Farm Mut. Auto. Ins. Co., 2007-NMCA-088, ¶ 35, 142 N.M. 346, 356, 165 P.3d 343, 353 (concluding that assessing pre-judgment interest does not serve the purpose

- 40 -

of the statute by assessing pre-judgment interest when the plaintiff does not point to any evidence or argue that the defendant is a source of unreasonable delay, and the case involves difficult legal issues which preclude settlement); Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, ¶ 55, 127 N.M. 47, 60, 976 P.2d 999, 1012 ("'Awarding prejudgment interest on compensatory damages . . . ensures that just compensation to the tort victim is not eroded by the dilatory tactics of the tortfeasor . . . .'")(quoting Calleon v. Miyagi, 76 Hawai'i 310, 876 P.2d 1278, 1290 (1994))(alterations in Coates v. Wal-Mart Stores, Inc.).[47]  There is also, however, no evidence of settlement offers that the Loewens make in an effort to settle the case, which supports the award of prejudgment interest.  See Guest v. Allstate Ins. Co., 2024-NMCA-022, ¶ 50, 542 P.3d 768, 782 (upholding the award of prejudgment interest when the defendant contributes to delay by "requesting broad additional discovery" and provides "no information concerning any attempts at settlement, a necessary consideration when awarding prejudgment interest"); Fort Knox Self Storage, Inc. v. W. Techs., Inc., 2006-NMCA-096, ¶ 42, 140 N.M. 233, 242, 142 P.3d 1, 10, as corrected (Aug. 29, 2006)(upholding prejudgment interest award when the complaining party fails to present any information of attempts at settlement).[48]  Because one consideration for awarding prejudgment interest -- preventing delay -- tips in favor of not awarding prejudgment interest, and the other consideration -- fostering settlement -- tips in favor of awarding prejudgment interest, the Court concludes that it is appropriate to award half of the maximum available prejudgment

---

[47] The Court predicts that the Supreme Court of New Mexico would agree with Abeita v. Northern Rio Arriba Electric Cooperative and Bird v. State Farm Mut. Auto. Ins. Co., because the New Mexico Court of Appeals merely expands upon the principle regarding dilatory tactics of the defendant stated by the Supreme Court of New Mexico in Coates v. Wal-Mart Stores, Inc., 1999-NMSC-013, ¶ 55, 127 N.M. 47, 60, 976 P.2d 999, 1012.

[48] The Court predicts that the Supreme Court of New Mexico would agree with Guest v. Allstate Ins. Co. and Fort Knox Self Storage, Inc. v. W. Techs., Inc., because these cases expound on a factor, settlement offers, found in § 56-8-4(B).

interest under the statute.  The Court therefore awards the McNeills five percent prejudgment interest.  Under § 56-8-4(B), prejudgment interest is calculated "from the date the complaint is served upon the defendant . . . ."  Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 17 n.6, 117 N.M. 373, 377 n.6, 872 P.2d 346, 350 n.6.  The McNeills serve the Complaint upon the Loewens on January 10, 2024.  See Summons in a Civil Action, at 2, filed January 11, 2024 (Doc. 3).  The damages in this case of  $289,123.20 are awarded on June 1, 2026.  The total prejudgment interest awarded, therefore, is $34,405.66.

27.     "[A]n award of postjudgment interest is mandatory and is to be computed at the statutory rate."  Sunwest Bank of Albuquerque, N.A. v. Colucci, 1994-NMSC-027, ¶ 25 n.7, 117 N.M. 373, 379 n.7, 872 P.2d 346, 352 n.7.  Section 56-8-4(A)(2) provides that:

> Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of [8.75] percent per year, unless . . . the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of [15] percent.

N.M. STAT. ANN. § 56-8-4(A)(2) (1978).  The Court concludes that the Loewens do not act in bad faith, or intentionally or willfully breach the contract during the third year of grazing rights.  The Loewens breach the contract by placing conditions on the McNeills' ability to graze, which ultimately contradicts the Purchase Agreement's language that the grazing rights are available at "no charge to Seller."  Purchase Agreement ¶ 2, at 1.  The Loewens do not breach this provision intentionally or willfully; the Court determines that this language in the Purchase Agreement is ambiguous, and the Court, acting as fact-finder, must resolve its meaning.  Accordingly, in the absence of bad faith, intentional, or willful conduct on the part of the Loewens, the Court assesses post-judgment interest at 8.75% per year.

**IT IS ORDERED** that: (i) the Court does not grant judgment for Plaintiff William McNeill and Lisa McNeill against Defendant Willie Loewen and Eva Loewen for the first year of grazing

rights under the New Mexico Ranch Purchase Agreement, ¶ 2, at 1 (dated November 11, 2021)(admitted into evidence on March 16, 2026 on Day 1 of the Bench Trial as Plaintiff Tr. Ex. 1); (ii) the Court does not grant judgment for the McNeills against the Loewens for the second year of grazing rights under the Purchase Agreement; (iii) the Court grants judgment against the Loewens for the third year of grazing rights in the amount of $289,123.20; (iv) all parties shall bear their own attorney's fees and costs; (v) the Court grants the McNeills five percent prejudgment interest, $34,405.66; (vi) the Court grants the McNeills eight and a half percent post-judgment interest; (vii) the McNeills are awarded a total award of $323,528.86.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jason B. Hamm
Jared M. Moore
Hamm Law Group, PLLC
Midland, Texas

    *Attorneys for the Plaintiffs*

Jody Jenkins
Jenkins, Wagnon & Young, P.C.
Lubbock, Texas

    *Attorneys for the Defendants*